# In the United States Court of Federal Claims

No. 92-675 L
(E-Filed: September 27, 2006)

| | |
|---|---|
| CHIPPEWA CREE TRIBE OF THE ROCKY BOY'S RESERVATION, Plaintiffs, v. THE UNITED STATES, Defendant. | Indian Tucker Act; 28 U.S.C. § 1505 (2000); Motion to Reconsider; Effect of Per Capita Distribution of Judgment Funds on Nature of the Claim; Due Process Considerations Under 28 U.S.C. § 1505; Trust Responsibility Within the Context of Litigation |

Melody L. McCoy, Boulder, CO, for plaintiff.

Carol Catherman, with whom was Kelly A. Johnson, Acting Assistant Attorney General, Environment & Natural Resources Division, Department of Justice, Washington, DC, for defendant. Elisabeth C. Brandon, Office of the Solicitor, U.S. Department of the Interior, Washington, DC, of counsel.

OPINION

HEWITT, Judge

Before the court is Defendant's Motion for Reconsideration of a Portion [of] the Court's Opinion and Order Dated January 26, 2006 (Def.'s Recons. Mot. or Motion for Reconsideration) and its corresponding brief (Def.'s Br. or Brief), Plaintiffs' Opposition to Defendant's Motion for Reconsideration of a Portion of the Court's Opinion and Order Dated January 26, 2006 (Pls.' Resp. or Response), and Defendant's Reply Brief in Support of Defendant's Motion for Reconsideration of a Portion of the Court's Opinion and Order Dated January 26, 2006 (Def.'s Reply). The Opinion referenced by defendant's motion is Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States, 69 Fed. Cl. 639 (2006) (Chippewa). Defendant moves the court pursuant to Rules 54(b) and 59(a) of the Rules of the Court of Federal Claims (RCFC) to "reconsider[] . . .

the ruling declaring that the Pembina Judgment Fund ("PJF") per capita beneficiaries are an 'identifiable group' under the Indian Tucker Act, 28 U.S.C. § 1505, for purposes of litigating claims that the United States mismanaged PJF monies, and designating the Tribal Plaintiffs as the representatives of that group." Def.'s Recons. Mot. 1.[1]

I. Background

The historical background to this case is presented in detail in our earlier Opinion. See Chippewa, 69 Fed. Cl. at 644-46. A brief summary of facts relevant to defendant's Motion for Reconsideration is provided here. The funds at issue in this case were awarded in suits brought by descendants of the Red Lake Band of Chippewa Indians and the Pembina Band of Chippewa Indians challenging the compensation received for lands located along the Red River in what are now the states of North Dakota and Minnesota. The lands were ceded to the United States in two separate agreements. See Red Lake, Pembina and White Earth Bands v. United States, 164 Ct. Cl. 389, 392-93 (1964); Turtle Mountain Band of Chippewa Indians v. United States, 490 F.2d 935, 938 (Ct. Cl. 1974).

The first suit sought compensation for 7,488,280 acres ceded to the United States under the Treaty of October 2, 1863, 13 Stat. 667, as modified by the Treaty of April 12, 1864 (1863 Treaty), for which the United States had paid eight cents an acre. Red Lake, Pembina and White Earth Bands, 164 Ct. Cl. at 394. The Indian Claims Commission found the payment to be unconscionable and granted a gross award of $3,369,726.00 to the plaintiff tribes, with a net value of $2,760,245.64 (the 1964 Award). Id. One third of the gross settlement was adjudged for the Pembina Band. Id. at 399. The Court of Claims also addressed the distribution of the 1964 Award and determined that "the award must go to the tribal entities rather than descendants of the bands." Id.

Congress appropriated funds to satisfy the 1964 Award and a number of other settlements and judgments by the Deficiency Appropriation Act of 1964, Pub. L. No. 88-317, 78 Stat. 204. In 1971, Congress approved a plan for the distribution of the 1964 Award. Pub. L. No. 92-59, 85 Stat. 158 (1971) (codified at 25 U.S.C. §§ 1241-1248 (2000)) (1971 Distribution Act). The 1971 Distribution Act apportioned the 1964 Award among four beneficiaries: (1) the Minnesota Chippewa Tribe (White Earth Band), (2) the Turtle Mountain Band of Chippewas of North Dakota, (3) the Chippewa Cree Tribe of Montana, and (4) the group of lineal descendants of the Pembina bands which were

[1]Defendant cites RCFC 59(b) in the opening of its Motion for Reconsideration but elsewhere refers, more appropriately, to subsection (a) of that rule. See e.g., Def.'s Br. 8; Def.'s Reply 1. For the purposes of the court's review, the court understands defendant to ground its Motion for Reconsideration on RCFC 59(a).

parties to the 1863 Treaty but who were not eligible for membership in any of the three named beneficiary tribes (the non-member Pembina descendants). See 25 U.S.C. § 1244. The Secretary of the Interior was instructed to establish a roll of eligible Pembina descendants, 25 U.S.C. § 1242, and to apportion funds among the three named tribes according to their enrolled membership, with the remaining funds distributed in equal shares among the non-member Pembina descendants. 25 U.S.C. § 1244. The three named tribal beneficiaries also requested that their portions of the 1964 Award be distributed to eligible members on a per capita basis. Chippewa, 69 Fed. Cl. at 645. Distribution of the 1964 Award began in October 1984, twenty years after appropriation of the judgment funds. Id.

The second suit sought just compensation for about 10 million acres of land in North Dakota that was not ceded under the 1863 Treaty but from which many of the Pembina Chippewa were subsequently compelled to move on threat of loss of their annuities negotiated under the 1863 Treaty. See Turtle Mountain Band, 490 F.2d at 938. In a suit brought by the Turtle Mountain Band of Chippewa Indians, the Red Lake and Pembina Bands, and the Little Shell Band of Chippewa Indians, the Indian Claims Commission awarded the plaintiffs $52,527,337.97 as additional compensation for land ceded by the 1892 Agreement. See United States v. Turtle Mountain Band of Chippewa Indians, 612 F.2d 517, 518-19 (1979) (noting that the award represents "the difference between the fair market value of the land on the date of extinguishment of the aboriginal title and the compensation the government previously paid for the land"). The net award of $47,376,622.93, reflecting offsets and adjustments of $5,150,715.04, was decided in a partial judgment of March 18, 1980. Turtle Mountain Band of Chippewa Indians v. United States, 229 Ct. Cl. 872, 872 (1981). The net award was augmented by $4,900,715.04 awarded in a December 1, 1981 judgment, bringing the total of the two awards to nearly $52 million (collectively, the 1980 Award). Id. Congress made two separate appropriations, in March 1980 and December 1981, to satisfy the judgments constituting the 1980 Award. Id. The 1964 Award and the 1980 Award collectively make up what the parties refer to as the Pembina Judgment Fund (PJF).

Congress provided for the use and distribution of the 1980 Award in December 1982. See Pub. L. No. 97-403, 96 Stat. 2022 (1982) (1982 Distribution Act). Section 2 of the 1982 Distribution Act divided the appropriated funds and the accrued interest and investment income among the Turtle Mountain Band of Chippewa Indians, the Chippewa Cree Tribe of Rocky Boy's Reservation, the Minnesota Chippewa Tribe, the Little Shell Band of Chippewa Indians, and the non-member lineal Pembina descendants. Id. § 2. For the four tribes or bands, the funds were to be divided into two portions: 80% of the funds were to be distributed among the eligible members of the tribe or band in the form of per capita payments, with the remaining 20% of funds retained in the Treasury and

available to the governing body of the tribe or band on the basis of an annual program budget, subject to the approval of the Secretary of the Interior. Id. §§ 3-6. A partial distribution of the per capita funds was initiated in May 1988 and the final per capita distribution was carried out in 1994. See Chippewa, 69 Fed. Cl. at 645-46. Defendant continues to hold the 20% of funds retained for the four tribal beneficiaries for tribal programs. Id. at 646.

Defendant's Motion for Reconsideration requests reconsideration of a procedural portion of the court's Chippewa Opinion, specifically the court's decision that this case may proceed as an action under 28 U.S.C. § 1505 rather than under other procedural rules. This opinion does not revisit the underlying substantive issues addressed in the Opinion that concern plaintiffs' contention that the 1964 Award and the 1980 Award were, when appropriated by Congress to satisfy the judgments rendered by this court, then and thereafter held by the government in trust for the Indian owners of these funds and that fiduciary obligations attached to them; plaintiffs' claim that the government breached its trust obligations under the general investment statutes applied to trust funds, including 25 U.S.C. §§ 161, 161a and 162a; and plaintiffs' claim that the losses suffered due to the alleged breaches of fiduciary duties are compensable as damages. See Chippewa, 69 Fed. Cl. at 646.

## II. Discussion

### A. Standard of Review

The Rules of the Court of Federal Claims provide for reconsideration and revision of court orders and decisions at any time prior to the entry of judgment on all claims and all parties involved in the action. See RCFC 54. Rule 54 provides in pertinent part that "any order or other form of decision . . . which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." RCFC 54(b) (2006). Rule 59 addresses motions for reconsideration:

> A new trial or rehearing or reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States. On a motion under this rule, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

RCFC 59(a)(1). The decision to grant a motion for reconsideration lies within the sound discretion of the court. Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990); Seldovia Native Ass'n Inc. v. United States, 36 Fed. Cl. 593, 594 (1996) . The court must consider such a motion with "exceptional care." Carter v. United States, 518 F.2d 1199, 1199 (Ct. Cl. 1975). To prevail on a motion for reconsideration, the movant must point to a manifest error of law or mistake of fact. Franconia Assocs. v. United States, 44 Fed. Cl. 315, 316 (1999). The movant does not persuade the court to grant such motion by merely reasserting arguments which were previously made and were carefully considered by the court. Principal Mut. Life Ins. Co. v. United States, 29 Fed. Cl. 157, 164 (1993) (quoting Frito Lay of P.R., Inc. v. United States, 92 F.R.D. 384, 391 (D.P.R. 1981)); Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1231 (3d Cir. 1995) ("Whatever other circumstances may justify reconsideration, mere presentation of arguments or evidence seriatim does not."). A motion for reconsideration "is not intended to give an unhappy litigant an additional chance to sway the court." Bishop v. United States, 26 Cl. Ct. 281, 286 (1992) (quoting Circle K Corp. v. United States, 23 Ct. Cl. 659, 664-65 (1991)). Rather, the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice. Henderson County Drainage Dist. No. 3 v. United States, 55 Fed. Cl. 334, 337 (2003) (citing Fru-Con Constr. Corp., 44 Fed. Cl. at 301). Defendant summarizes its argument in the following terms:

> 1) [T]he per capita claims cannot be litigated under the Indian Tucker Act [codified at 28 U.S.C. § 1505], because they are individual, not group, claims; 2) after distribution, the per capita beneficiaries lack a collective interest in a group asset and therefore do not qualify as an "identifiable group" under the Indian Tucker Act; 3) the Tribes lack the status to pursue group claims which can be litigated only by the entity to which they belong; and 4) given that the per capita claims are individually held, that the claims of absent individuals are being litigated, and due process requirements have not been met.

Def.'s Recons. Mot. 1. On the basis of its argument, defendant

> respectfully requests that the Court reconsider and vacate the January 26, 2006 ruling allowing the per capita claims to be litigated as a "group claim" under the Indian Tucker Act with the Plaintiff Tribes representing the per capita beneficiaries, enter an order denying Plaintiffs' motion for class certification on the grounds argued in the United States' opposition briefs and Motion to Supplement the Record with Declaration of Ross O.

> Swimmer, filed January 17, 2006, and order the Plaintiffs to demonstrate a valid basis for litigating the individual per capita claims of parties who are not before this Court.

Id. at 2. Defendant's challenge to the court's application of 28 U.S.C. § 1505 is based both on jurisdictional and due process grounds. The court addresses each of defendant's arguments and finds them to be without legal foundation or merit. For the following reasons, defendant's Motion for Reconsideration is DENIED.

B. Group Claims Under 28 U.S.C. § 1505

Central to defendant's argument for reconsideration is the proposition that plaintiffs' claims of mismanagement of the trust funds held by the government from the 1964 Award and the 1980 Award to the Pembina Indians are legally distinct claims held on the one hand by the Tribes and, on the other hand, held severally by the individual recipients of that portion of the PJF that was distributed on a per capita basis: what defendant characterizes as "per capita claims". See Def.'s Br. 5 ("The PJF per capita claims alleged here . . . are vested in and held by individuals, not by a group. The per capita shares have been individualized.") (footnote omitted); id. at 25 ("The Tribes cannot claim to be PJF per capita beneficiaries of either the 1964 [or] 1980 awards; their only interest is in the twenty-percent of the 1980 award allocated as Tribal program funds that remains held in trust."). Defendant recognizes that the claims litigated by the plaintiffs before the Indian Claims Commission and the Court of Claims that led to the judgments constituting the Pembina Judgment Fund were group claims advanced by an "identifiable group" of Pembina descendants as a group plaintiff. See Def.'s Reply 5. Defendant acknowledges specifically that

> [t]he land compensation claims bore the hallmarks of a classic Tribal claim. The Pembina Band as a whole ceded undivided lands to the United States and later brought an action claiming that the United States underpaid the Tribe for the ceded lands. The Tribe had a communal claim for additional compensation and that coupled with its "identifiable group" status brought the action within the jurisdiction of the [Indian Claims Commission Act].

Id.; Def.'s Br. 23 (noting that "[f]our decades ago . . . the Pembina descendants were litigating a communal claim for lands ceded to the United States"). Defendant argues that "the per capita claims asserted here lack the essential characteristics of a group claim" because "there is no longer a group-owned asset or fund in which the per capita beneficiaries have a group interest." Def.'s Br. 21-22. The court, defendant contends, therefore lacks jurisdiction to hear claims of individual Indians under the "identifiable

group" provision of the Indian Tucker Act, 28 U.S.C. § 1505.[2] Def.'s Br. 10-11. According to this argument, the distribution of the 1964 Award and the 1980 Award to the descendants of the Pembina Band whose land was ceded to the United States by treaty transformed the communal interest the descendants of the Pembina Band held in the land into "individual, vested property rights." Id. at 22. Defendant concludes that "[c]lassifying the individually-held, vested per capita claims as a 'group claim' is a clear error of law" and "[i]f allowed to stand, . . . will result in manifest injustice by failing to guarantee the due process rights of individual per capita PJF beneficiaries who are not before this Court." Def.'s Reply 1 (footnote omitted).

Defendant cites no legal authority for its novel propositions that a group claim is converted into separate individual claims upon distribution of the communal asset, and that the process of distribution itself creates "individual, vested property rights" held by each recipient of the group asset. Def.'s Br. 22. The reason for defendant's failure to cite relevant authority is apparent to the court: there is none. Indeed, defendant's leading authority, Hebah v. United States, 428 F.2d 1334, 1338-39 (Ct. Cl. 1970) (Hebah), contradicts defendant's central proposition.

Defendant cites Hebah as support for the assertion that individual claims brought by or on behalf of an individual Indian cannot be heard under 28 U.S.C. § 1505 but may be heard under the court's Tucker Act jurisdiction, codified at 28 U.S.C. § 1491, Def.'s Br. 13, a jurisdictional point that is not in dispute. Hebah was a suit brought by an individual Indian, the widow of a man who was shot by an officer of the Indian Police force as he fled his home after being tear-gassed. 428 F.2d at 1336. Hebah's widow brought suit in her own behalf and that of her children to recover damages for her husband's death on the ground that Hebah's death was unlawful and that the Indian Police officer who killed him was a "bad man" under the terms of the 1868 Treaty

---

[2]The Indian Tucker Act, as codified at 28 U.S.C. § 1505, provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505 (2000).

between the United States and "the Eastern Band of Shoshonees and the Bannack Tribe of Indians." Id. at 1335-36. Article I of the 1868 Treaty provided in pertinent part:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof . . . , proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

Id. at 1335 (quoting Treaty of July 3, 1868, 15 Stat. 673). The Court of Claims determined that, unlike the "very great majority of Indian treaties [that] create tribal, not individual, rights, . . . Article I of the 1868 Treaty . . . concern[ed] the rights of and obligations to individual Indians." Id. at 1337.

Defendant, while citing Hebah for the proposition that "with some exceptions, [the] 'great majority of Indian treaties create Tribal, not individual rights,'" see Def.'s Br. 15, fails to acknowledge the court's analysis–in the sentences immediately following the quoted phrase–of legal precedent regarding the retention of the tribal, or group, character of treaty-based rights even where financial payments may ultimately go to individual beneficiaries, see Hebah, 428 F.2d at 1337. The court in Hebah cites Blackfeather v. United States, 190 U.S. 368, 377 (1903) for the following principle:

> The United States, as the guardian of the Indians, deal with the nation, tribe, or band, and have never, so far as is known to the court entered into contracts either express or implied, compacts, or treaties with individual Indians so as to embrace within the purview of such contract or undertaking the personal rights of individual Indians.

Hebah, 428 F.2d at 1337 (noting that the principle enunciated by the Court is quoted from the Court of Claims decision in Blackfeather v. United States, 37 Ct. Cl. 233, 241 (1902)). The Hebah court then states that "[t]his principle has been carried into effect even where a treaty provided for financial payments to specified beneficiaries out of annuities paid to the tribe; the holding was that, nevertheless, individual rights against the Federal Government were not created by the treaty." Id. (citing Sac and Fox Indians of the Mississippi in Iowa v. Sac and Fox Indians of the Mississippi in Okla., 220 U.S. 481, 484, 486, 487, 489 (1911), aff'g 45 Ct. Cl. 287, 300-01, 304 (1910)) (emphasis added).

The Hebah court distinguished the situation described in Blackfeather from that of the individual claimant then before it by noting that the 1868 Treaty's "bad man" provision created an individual third-party contractual right through which an individual

claimant could seek reimbursement directly from the United States. Hebah, 428 F.2d at 1338. In the case of the "bad man" provision, "[t]he tribe is not to be the channel or conduit through which reimbursement is to flow . . . . The obligation and the right are each individual and personal." Id. In contrast, the treaties involved in Blackfeather and Sac and Fox Indians "called for sums to be paid to and through the Indian group as a unit, even though ultimate beneficiaries may have been specifically designated; the primary recipient was still the tribe or band." Id. at 1337-38 (emphasis added). The distribution of communal assets, whether moneys paid by the government as part of a land cession treaty or trust funds derived from a court judgment–as in the case before the court–does not create an individual right on the part of the beneficiary where the tribe is "the channel or conduit through which reimbursement is to flow." Id.

The Treaty with the Red Lake and Pembina Bands of Chippewa of October 2, 1863 (1863 Treaty), 13 Stat. 667, provided for payment to the Red Lake and Pembina bands of "twenty thousand dollars per annum for twenty years" and other sums. See 1863 Treaty, art. 3. The payment was "to be distributed among the Chippewa Indians of the said bands in equal amounts per capita." Id. Applying the principle stated in Blackfeather, 190 U.S. at 377, and followed by this court in Hebah, 428 F.2d at 1337-38, the rights created by the 1863 Treaty were held by the tribe, even though payments were made to individuals. The payments were "to be paid to and through the Indian group as a unit, even though ultimate beneficiaries may have been specifically designated." Hebah, 428 F.2d at 1337. As this court noted in its Opinion, the 1964 Award, a judgment rendered by the Indian Claims Commission and affirmed by the Court of Claims in Red Lake, Pembina and White Earth Bands v. United States, 164 Ct. Cl. 389, 394, 399 (1964) was awarded "to the tribal entities rather than descendants of the bands." Chippewa Cree, 69 Fed. Cl. at 644 (quoting Red Lake, Pembina and White Earth Bands, 164 Ct. Cl. at 399).

Defendant does not identify by what authority the alleged "individual, vested property rights," Def.'s Br. 22, were created and granted to the recipients of the per capita distributions of the 1964 Award and the 1980 Award. Defendant appears to suggest that the distribution acts for each award may, in some unspecified way, have figured in the creation of the alleged individual rights. See Def.'s Br. 22 ("The PJF per capita monies were allocated and disbursed over a decade ago. See 1971 Distribution Act [Pub. L. No. 92-59, 85 Stat. 158 (1971) (codified at 25 U.S.C. §§ 1241-1248 (2000))]; 1982 Distribution Act [Pub. L. No. 97-403, 96 Stat. 2022 (1982)]. That process individualized the rights of the per capita beneficiaries and gave them individual, vested property rights.") (emphasis added). If this is defendant's contention, it is unfounded. Again, drawing on case law cited in defendant's brief, see Def.'s Br. 13, 15 (citing Hebah, 428 F.2d at 1337-39), statutes that direct the government in the manner tribal funds are to be

distributed do not create individual rights; where the tribe or group is the conduit through which benefits are distributed, "the primary recipient [is] still the tribe or band." Hebah, 428 F.2d at 1337-38; see also Sac and Fox Indians, 220 U.S. at 483-84; Wis. & Mich. Ry. Co. v. Powers, 191 U.S. 379, 387 (1903).

The facts and issues of law addressed by the United States Supreme Court in Sac and Fox Indians parallel, in important respects, those raised in defendant's Motion for Reconsideration. In brief, the Sac and Fox Indians of the Mississippi ceded land then occupied by them in Iowa under the Treaty of October 11, 1842, 7 Stat. 596, and were granted in return land in what is now Kansas. Sac and Fox Indians, 220 U.S. at 482. While most of the members of the tribe moved to Kansas, some returned without permission to what had been the Iowa reservation, id. at 482-83, eventually winning the consent of the legislature of Iowa to remain there, as well as the legislature's request to the United States for payment of "their proportion of the annuities due or to become due to the tribe," id. at 483. Payments were made initially according to the terms of the Appropriation Act of Aug. 30, 1852, ch. 103, § 3, 10 Stat. 56, (codified at 25 U.S.C. § 111 (2000)). Id. The Court rejected the claim for payment of annuities under the Treaty of 1842 raised by the group that had returned to Iowa without authorization, noting that the "[t]he [appropriation] act of 1852 gave no vested rights to individuals. It was not a grant to the Indians, but a direction to agents of the United States . . . . The promises in the treaties under which the annuities were due were promises to the tribes." Id. at 483-84 (citations omitted). Indians absent from the reservation in Kansas without authorization of the United States had no individual rights to the annuities promised to the tribe in the treaty and paid at the tribal agency in conformity with the Appropriation Act of 1852. Id.

A subsequent treaty made in 1867, by which the tribes sold their land in Kansas and agreed to move to Indian Territory in what is now Oklahoma, provided for payment of annuities only to those members living on the reservation, with the exception of those Sac and Fox Indians then living in Tama county, Iowa, who were to "be paid pro rata, according to their numbers." Id. at 485. The Court denied that an appropriation act approved in 1867 in furtherance of the 1867 treaty created individual rights, employing the same reasoning the court had applied to the act of 1852. Id. ("This is subject to the same comment as the act of 1852 when relied upon as a foundation for individual rights under it."). In 1884, an appropriation for interest payable under the treaty of 1842 was authorized, providing for per capita payments to the Iowa group based on their original numbers and in proportion to the amount appropriated in the 1884 act. Id. at 485-86. Once again, the Court made clear that the appropriations act in question created no individual rights, noting that

> here for a third time we are dealing, with a statute, not with a treaty. There is no intimation of an intent to change the terms of the treaties, by which the contracts were made not with individuals, but with the tribes. The statute neither changed nor conferred rights. It simply directed the Secretary of Interior how the contracts of the United States should be performed.

Id. at 486 (emphasis added). The Court concluded that none of the three appropriations acts in question conferred individual rights on members of the Sac and Fox Indians who had returned to Iowa. "The acts of 1852 and1867 did not shift the treaty rights from the tribes to the members, create new rights, or enlarge old ones. . . . The act of 1884 no more created individual rights than did the act[s] of 1852 and 1867." Id. at 490.

Applying the legal principle enunciated by the Supreme Court in Sac and Fox Indians, the court concludes that the 1971 and 1984 Distribution Acts approved by Congress in regard to the 1964 Award and the 1980 Award to the descendants of the Pembina Band, while providing for the allocation of the Awards to individual beneficiaries on a per capita basis, did not create individual rights vested in the beneficiaries and therefore did not endow individual recipients with the right to bring suit against the United States for individual claims of mismanagement of communally-held trust funds. Sac and Fox Indians, 220 U.S. at 483-84, 486, 489-90; see also Hebah, 428 F.2d at 1337. The 1971 and 1984 Distribution Acts "simply directed the Secretary of Interior how the contracts of the United States should be performed." Sac and Fox Indians, 220 U.S. at 486.

The language used by Congress in the 1971 Distribution Act, quoted below in pertinent part, underscores the principal enunciated in Blackfeather, 190 U.S. at 377, that treaties between the United States and Indian tribes create tribal or group rights, not individual rights, and that distribution acts and similar statutes concerning the allocation or distribution of communal funds do not create new, individual rights but are simply the means Congress employs to provide instructions to the Secretary of the Interior or other government official in carrying out treaty terms, Sac and Fox Indians, 220 U.S. at 483.

> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the funds appropriated by the Act of June 9, 1964 (78 Stat. 204, 213), to pay a judgment to the Pembina Band of Chippewa Indians in Indian Claims Commission dockets numbered 18-A, 113, and 191, together with the interest thereon . . . shall be distributed as provided herein.

> SEC. 2. The Secretary of the Interior shall prepare a roll of all persons born on or prior to and living on the date of this Act who are lineal descendants of members of the Pembina Band as it was constituted in 1863 . . . .
>
> . . . .
>
> SEC. 4. In developing the roll of Pembina descendants, the Secretary of the Interior shall determine which enrollees are members of the Minnesota Chippewa Tribe, the Turtle Mountain Band of Chippewas of North Dakota, or the Chippewa-Cree Tribe of Montana, and subsequent to the establishment of the descendancy roll shall apportion funds to the three cited tribes on the basis of the numbers of descendants having membership with these tribes. Funds not apportioned in this manner shall be distributed in equal shares to those enrolled descendants who are not members of the three cited tribes.

1971 Distribution Act, 85 Stat. 158, (codified at 25 U.S.C. §§ 1241, 1242, 1244) (emphasis added). The funds were appropriated as a result of a judgment in favor of the Pembina Band of Indians; the Secretary of the Interior was instructed to draw up rolls of eligible descendants of the band, and to apportion the funds among the three tribes according to each tribes' proportion of Pembina descendants, with the rest to be distributed to non-member lineal descendants. The 1982 Distribution Act includes language to the same effect.[3] See 1982 Distribution Act, 96 Stat. 2022.

Defendant's theory of the creation of individual, vested rights is based neither on specific treaty provisions nor on the language of the relevant PJF-related statutes. It appears to be based on the suggestion that somehow the process of distribution creates

---

[3] Section 2 of the 1982 Distribution Act provides:

> All of the funds appropriated with respect to the judgment awarded the Pembina Chippewa Indians in dockets 113, 191, 221, and 246 . . . shall be divided by the Secretary of the Interior . . . among the Turtle Mountain Band of Chippewa Indians, the Chippewa Cree Tribe of Rocky Boy's Reservation, the Minnesota Chippewa Tribe, the Little Shell Band of the Chippewa Indians of Montana, and the nonmember Pembina descendants (as a group) so that each is allocated an amount which bears the same relationship to such funds as the number of members of such band, tribe, or group . . . bears to the sum of [enrolled descendants].

1982 Distribution Act, § 2, 96 Stat. 2022.

individual rights. See Def.'s Br. 22; Def.'s Reply 6. Defendant's theory of spontaneous creation of individual rights is without legal foundation. Any rights established by treaty were held by the descendants of the Pembina Band as a group. See E. Band of Cherokee Indians v. United States, 7 Ind. Cl. Comm'n 140, 154 (1958) ("In connection with the proceeds of the sale or sales of tribal lands, the conversion of realty into money does not change the fundamental character of the corpus of the transaction; proceeds therefrom still remain tribal property."). The 1964 Award and the 1980 Award to the Pembina Band were held in undivided trust fund accounts up to the time of distribution, either to individual Pembina descendants or to the recognized tribes. See Chippewa, 69 Fed. Cl. at 666-68. Plaintiffs' claims involve allegations of mismanagement during the time the 1964 Award and the 1980 Award were held in trust by the government. Plaintiffs are not seeking to recover for mismanagement of funds after they were deposited into a given recipient's Individual Indian Money (IIM) account. Rather, the alleged injury took place while the trust funds were held in common by the trustee. See Pls.' Resp. 13 ("Plaintiffs have made clear repeatedly that this action raises claims of alleged breaches of trust on the part of the fiduciary up until the point of any valid and proper distribution(s) of the PJF by the trustee to its beneficiaries."). The group character of plaintiffs' claims and the undivided communal status of trust funds during the period when the injury was allegedly sustained were addressed in this court's Opinion as follows:

> At the heart of plaintiffs' claims against the government is the allegation that the government mismanaged and otherwise failed properly to invest the [PJF] from the time the funds were appropriated to the time of their distribution to per capita beneficiaries, and (with respect to certain funds held in trust) thereafter. It appears, consistent with plaintiffs' allegations, that the moneys deposited into the Treasury from the 1964 and 1980 Awards were maintained in separate accounts for each award but were not distributed to tribe-specific accounts until the time of distribution to the per capita beneficiaries.
>
> With respect to the 1964 Award, it appears unlikely that any funds could have been deposited in tribe-specific trust accounts either prior to or following the per capita distribution of the 1964 Award. It would not have been possible for funds to have been deposited to tribe-specific accounts based on the proportion of Pembina descendants in any tribe prior to the completion of the roll of eligible beneficiaries in October 1984. . . . It appears that, from the time of the deposit of the 1964 Award into the Treasury until October 1984 at the earliest, the 1964 Award was not maintained in tribe-specific accounts.

> . . . .
>
> . . . It is the court's understanding that from the time of their deposit in the Treasury in 1980 and 1981 until at least 1988 when the Department of the Interior had finalized a list of eligible tribal members and nonmember Pembina descendants as required under the 1982 Distribution Act, all 1980 Award funds were treated alike in terms of investment and accounting. Until the time the rolls were prepared for the per capita distribution, there was an identity of interest among the tribal beneficiaries of the Award and the group of nonmember lineal descendants. Any breach by the government of its duties in regard to the management and investment of trust funds during that time would be experienced as an injury common to and indistinguishable in effect on all named tribal beneficiaries and the group of nonmember lineal descendants.

Chippewa, 69 Fed. Cl. at 666-68 (emphasis added) (citations omitted). Plaintiffs' claims involved the management and investment of undivided trust funds held in Award-specific trust accounts. Id. Any breach by government of its trust responsibilities "would be experienced as an injury common to . . . all named tribal beneficiaries and the group of nonmember lineal descendants." Id. at 667. Any injury alleged by plaintiffs that was sustained following the per capita distributions would involve undistributed per capita allocations remaining in the PJF accounts and mismanagement of trust funds retained by the tribes. The distribution of a communal asset did not create individual claims against the United States for mismanagement during the time the funds were held in common, nor did the act of distribution dispel the government's fiduciary duty to account for the funds it managed for the Pembina descendants. Id. at 665 (concluding that "[d]efendant's attempt to avoid liability by arguing that its duty to trust fund beneficiaries terminated with the distribution of the funds is unavailing").

The government, as trustee of the 1964 Award and the 1980 Award, remains liable for any breach of duty sustained while the funds were held in its care. See United States v. Blackfeather, 155 U.S. 180, 193 (1894). In a suit brought by the Shawnee Tribe of Indians against the United States, plaintiff sought compensation for moneys allegedly wrongfully diverted from its tribal fund. See Blackfeather, 155 U.S. at 181. Among the claims brought by the Shawnee was a claim based on a treaty between the Shawnee residing in Ohio and the United States made August 8, 1831, 7 Stat. 355, in which the Shawnee ceded their lands in Ohio in exchange for lands west of the Mississippi. Id. at 188. Under Article 7 of the treaty, the United States agreed to place the net proceeds from the sale of the land into a fund "for the future necessities of said tribe" from which the chiefs were to be paid a five percent annuity for the general benefit of the people until

Congress or the chiefs, with the consent of the their people, agreed to dissolve the fund. Id. at 192.

The Court determined that the agreement to pay an annuity equal to five percent of the balance in the trust fund had the same effect as a promise to pay five percent interest on the funds held in trust. Id. The fund was dissolved on September 28, 1852 with the payment to the chiefs of the remaining balance of the proceeds from the land sale. Id. at 193. In 1893, the Court of Claims held that the United States had violated the treaty by selling some of the lands at private sales rather than at public auctions, resulting in underpayment for the ceded lands. Blackfeather v. United States, 28 Ct. Cl. 447, 456-57 (1893), rev'd, 155 U.S. 180 (1894). While the Supreme Court revised the amount of the underpayment fixed by the Court of Claims, 155 U.S. at 191-92, it affirmed the court's determination that the duty to pay interest on the unpaid funds remained despite the dissolution of the stipulation and distribution of funds, id. at 193. The Court explained that

> [w]hile the treaty bound the government to pay a 5 per cent annuity until the dissolution of the fund, which dissolution took place September 28, 1852, when the sum of $ 37,180.58–the amount of the fund resulting from actual sales–was paid over to the chiefs of the tribe, this dissolution terminated the stipulation for the annuity only protanto. If the government had originally accounted for the whole amount for which the court below held it to be liable, it would have paid 5 per cent upon this amount until the whole fund was paid over. The fund as to this amount being not yet distributed, the obligation to pay the 5 per cent annuity continues until the money is paid over.

Id. (emphasis added). The act of distributing funds held in trust by the United States does not dispel the trustee's fiduciary responsibility to the tribe or group for moneys unpaid or losses sustained while the tribe or group's funds were in the government's care. Id.; see also Peoria Tribe of Indians of Okla. v. United States, 390 U.S. 468, 471-72 (1968) (finding Blackfeather, 155 U.S. 180, controlling and holding that a treaty-based obligation to invest proceeds from the sale of ceded land "applie[d] to proceeds which, by virtue of the United States' violation of the treaty, were never in fact received"). This is a basic principle of trust law. See Restatement (Second) of Trusts § 345k: Liability for prior breach of trust ("Although the trustee has transferred the entire trust property to the beneficiary, he is not thereby discharged from liability for breaches of trust committed by him prior to the transfer."). This basic principle has been upheld repeatedly by the courts. See, e.g., United States v. Mitchell, 463 U.S. 206, 227 (1983) (Mitchell II) ("Absent a retrospective damages remedy, there would be little to deter federal officials from

violating their trust duties, at least until the allottees managed to obtain a judicial decree against future breaches of trust." (quoting United States v. Mitchell, 445 U.S. 535, 550 (1980))); Short v. United States, 50 F.3d 994, 998 (Fed. Cir. 1995) (holding, in regard to the application of trust fund investment statutes 28 U.S.C. §§ 161a, 161b, and 162a, that "[t]he government acknowledges that these statutes provide for the payment of interest on trust funds held by the United States for the benefit of Indians. It argues, however, that interest is payable only on money still held in such a trust fund. We do not agree.").

Defendant's recitation of cases that purportedly distinguish a group claim from individual claims, see Def's Br. 10, 12-18, adds no support to its underlying theory of the creation of individual rights. The facts and circumstances of those cases are readily distinguished from the factual situation of the case now before the court–which may explain the absence of any effort by defendant in its briefing to analogize between the facts and circumstances of the cases it cites in support of its proposition and the facts and circumstances of this case. The simple recitation of case law in regard to a matter that is not in dispute (the observation that 28 U.S.C. § 1505 does not grant the court jurisdiction over claims by individual Indians) does not justify consideration of a motion for reconsideration. See Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1231 (3d Cir. 1995) ("Whatever other circumstances may justify reconsideration, mere presentation of arguments or evidence seriatim does not.").

Defendant relies primarily on two cases in its effort to characterize plaintiffs' claims as individualized claims based on the per capita PJF distribution. See Def.'s Br. 16-19. The court finds that the principal cases cited, Cherokee Freedmen v. United States, 161 Ct. Cl. 787 (1963) and Fort Sill Apache Tribe of Okla. v. United States, 477 F.2d 1360 (1973), are not only readily distinguishable from this case, but also offer useful guidance on the character of group claims and the conduct of cases brought under the "identifiable group" provision of 28 U.S.C. § 1505.

In Cherokee Freedmen, the plaintiffs[4] alleged that they were improperly refused enrollment in the Cherokee Nation by the Dawes Commission and consequently suffered injury by not receiving allotments of Cherokee land then being divided. 161 Ct. Cl. at 789. The court noted that

> [a]bout ninety percent of the Cherokee Freedmen rejected by the Dawes Commission were found wanting because it was determined that they had not timely returned to Cherokee Territory within the six-month limit set by [the treaty] between the United States and the Cherokees . . . . The other rejected applicants were turned down for similar personal reasons.

Id. The Indian Claims Commission concluded, and the Court of Claims agreed, that "they were all individual claims dependent upon the individual facts and circumstances pertinent to the particular person asserting that he (or his ancestor) was wrongfully denied enrollment." Id. (emphasis added). The Freedmen's claims were therefore declared to be individual claims because the plaintiff group consisted exclusively of individuals who were formally denied membership in the Cherokee Nation by the Dawes Commission and were therefore determined to be ineligible to receive allotments of the tribe's land. Id. at 788-89. Resolution of the claims of each member of the plaintiff group, the court determined, "would depend upon individual proof as to each Freeman that he was qualified, under the general standards laid down in the 1866 Treaty, to be enrolled as a Cherokee. There is no common right or group interest." Id. at 789.

The facts and circumstances of the case before the court are quite different. Here, the "identifiable group" in question is defined as "[t]he group of beneficiaries of the 1964

---

[4]The Cherokee Freedmen were a group of former slaves of the Cherokees as well as "free colored persons" present in lands claimed by the Cherokee Nation at the time of the Civil War and who resided there following the war. See Cherokee Freedmen v. United States, 195 Ct. Cl. 39, 41 (1971). The Freedmen "were taken and deemed to be citizens of the Cherokee Nation by the Nation's constitution." Id. (internal quotations omitted). The plaintiffs

> represent a portion of such Freedmen–those who (or whose ancestors) were listed on two rolls of Cherokee Indians prepared before 1900 (the Wallace and Kern-Clifton rolls) but who were not included in the roll drawn up in the first decade of this century by the Dawes Commission under legislation authorizing and directing that tribunal to hear and determine applications for enrollment in the Nation.

Id.

and 1980 Awards, as defined in the 1971 and 1982 Distribution Acts, including their heirs, descendants, and successors-in-interest." Chippewa, 69 Fed. Cl. at 673. All beneficiaries, tribal and individual descendants of the Pembina Band, have a "common right [and] group interest," cf. Cherokee Freedmen, 161 Ct. Cl. at 789, in the proper management of the 1964 Award and the 1980 Award while in the hands of the trustee. The claims raised by plaintiffs can be evaluated without considering the "individual facts and circumstances pertinent to [a] particular person." Id. Congress, through the 1971 and 1982 Distribution Acts, determined who should receive the awards made in 1964 and 1980 to the Pembina Band of Chippewa Indians. If, after weighing all the evidence before it, the court determines that plaintiffs' claims have merit, any damages awarded will respect the determination by Congress of the persons entitled thereto.[5] As the Supreme Court noted in regard to the roll of eligible Cherokee Freedmen drawn up by the Dawes Commission at the direction of Congress, "[W]e are not required to consider the reasons which induced Congress to direct that a roll be made . . . . Congress had the power, and, as we have decided, exercised it." Cherokee Nation v. Whitmire, 223 U.S. 108, 117 (1912); see also Cherokee Freedmen v. United States, 195 Ct. Cl. 39, 48 (1971) (noting that "Congress (or its agent) is to settle disputes as to the composition of, or membership in, the group entitled to the money" from a judgment awarded by the court).

In Fort Sill Apache Tribe of Okla. v. United States, 477 F.2d 1360 (Ct. Cl. 1973), a case also cited by defendant, the plaintiff tribe brought suit "for injuries to the tribe's traditional power and structure resulting from the years of internment" of its members during a 27-year period of forcible relocation and confinement as prisoners-of-war. 477 F.2d at 1361-62. The plaintiff tribe[6] brought suit under Section 2 of the Indian Claims Commission Act (ICC Act) of August 13, 1946, ch. 959, § 2, 60 Stat. 1049, 25 U.S.C. §

---

[5]Defendant challenges the court's adoption as the "group plaintiff" under 28 U.S.C. § 1505 the group defined by Congress as the legitimate beneficiaries of moneys awarded to the Pembina Band of Chippewa Indians. See Def.'s Br. 23 n.22. Defendant argues that "the group permitted to litigate land compensation claims before the [Indian] Claims Commission is not the same as the group subsequently defined by Congress as the PJF per capita beneficiaries. . . . The group recognized by this Court is based on Congress' determination of the individuals entitled to share in the per capita distributions of the PJF, their heirs and successors. . . . [I]t is not valid to assume that the Pembina descendants who litigated the land compensation claims and the per capita beneficiaries who shared in a recovery for that litigation are one and the same." Id. The court declines defendant's invitation to disregard Congress' determination in a matter in which Congress' power is plenary. See Cherokee Nation v. Whitmire, 223 U.S. 108, 117 (1912).

[6]The suit was filed by the Fort Sill Apaches of the State of Oklahoma and by three individual Indians in a representative capacity on behalf of three bands of the aboriginal Chiricahua Apache Tribe. See Fort Sill Apache Tribe, 477 F.2d at 1361 n.1.

70a (1946), specifically under clause (2) relating to claims sounding in tort, and clause (5) for claims alleging absence of "fair and honorable dealings." Fort Sill Apache Tribe, 477 F.2d at 1362. In regard to the clause (2) tort claims, the court concluded that the tribe sought to "characterize a series of multiple torts committed on the individual members of this tribe as also constituting a tort against the tribe itself." Id. at 1363. The cause of action could be sustained "only if the [ICC] Act can be read to recognize a distinct right in the tribe to foster and protect its own form and structure." Id.

The court in Fort Sill Apache Tribe distinguished the situation in Cherokee Freedmen, 161 Ct. Cl. 787, which involved "joining, into one claim, many individual claims which contained common elements of proof," from the "critical issue of whether there is a distinct cause of action and right resting with the tribe itself." 477 F.2d at 1364. The court resolved the question by determining that the ICC Act was intended to cover claims "for specific deprivations of land or property or rights protected by treaty, statute, or then-existing law," not claims that allege "damage to the power structure and viability of the tribal unit; that is, damage to Indian peoplehood in general." Id. (noting a similar claim of damage to a tribe's power raised in Gila River Pima-Maricopa Indian Cmty. v. United States, 427 F.2d 1194 (1970)). The court in Fort Sill Apache Tribe saw the injury to the tribe as "subsumed by the multitude of individual claims" and held that under clause (2) of 25 U.S.C. § 70a "the [ICC] Act does not recognize in the tribe a separate and distinct right to recover for injuries so closely tied to those suffered personally by individual Indians, which injuries are the whole basis for any damage to the tribe as such." Id. at 1365.

With respect to the clause five "fair and honorable dealings" claim, the court noted that the United States is held liable under this clause only "where 'by its own acts, it has undertaken special duties which it has failed to fulfill.'" Id. (quoting Lipan Apache Tribe v. United States, 180 Ct. Cl. 487, 502 (1967)). The court phrased the issue as "whether the United States has undertaken a special duty to protect and foster the traditional power and structure of the tribal organization" and answered in the negative. Id. The court allowed "the possibility that under some treaty language the Government may have undertaken the responsibility of protecting the tribal structure of a given group" but noted that "[s]uch a special relationship . . . must be clearly indicated. This is not the situation in the case at hand where the pertinent treaty and Act of Congress do not deal with the matter at all." Id. at 1366. Without a specific duty to protect the tribal structure of the Apache plaintiffs, grounded in treaty or statute, the United States could not be held liable for actions that may have weakened that structure. See Lipan Apache Tribe, 180 Ct. Cl. at 502.

In contrast, the claims before this court involve the alleged breach of specific treaty and statute-based fiduciary responsibilities regarding the investment and management of trust funds awarded to plaintiffs as payment for land ceded by treaty to the United States. Chippewa, 69 Fed. Cl. at 662. The claims implicate a group asset held by the government in trust for the lineal descendants of the Pembina Band of Chippewa Indians who ceded the land. As the court stated in its Opinion:

> Based on the foregoing review of the history of the creation, use and distribution of the [PJF] and the statutory basis and legislative history of laws governing the investment of funds held in trust by the United States for the benefit of Indians, the court finds that the funds appropriated by Congress under the 1964 Award and the 1980 Award and deposited to the credit of the tribes with the Treasury were trust funds as defined under 31 U.S.C. § 1321. The executive branch has been charged by Congress with a fiduciary responsibility for the productive investment of funds held in trust for the Indians through the enactment and amendment of investment statutes that create specific fiduciary duties. A breach of those fiduciary duties gives rise to a Tucker Act claim for damages. See Shoshone [Indian Tribe of the Wind River Reservation v. United States], 364 F.3d [1339,] 1354 [Fed. Cir. 2004] (finding a "definitive requirement" that the government earn interest on trust funds and citing 25 U.S.C. §§ 161a and 162(a)).

Id. at 662. Because defendant, in its Motion for Reconsideration, has not challenged the court's holdings in regard to the trust character of the 1964 Award and the 1980 Award or the government's duty to invest trust funds according to the relevant investment statutes, the court concludes that defendant must recognize, as the court found, that, under the facts and circumstances of this case, the claims asserted by plaintiffs can be construed as group claims under Fort Sill Apache Tribe.

A similar analysis that distinguishes treaty and statute-based group claims from individual claims is provided in Northern Paiute Nation v. United States, 10 Cl. Ct. 401 (1986), cited extensively in defendant's reply brief. See Def.'s Reply 3, 4, 9. In this case, the Walker River Tribe[7] (Tribe) sought damages to compensate it for losses resulting from the government's failure to provide irrigation water to certain allotted irrigable land held by members of the Tribe. 10 Cl. Ct. at 402. The Tribe owned valuable mineral lands that were the subject of great interest by various white men and the Nevada

---

[7]The Walker River Tribe was one of various tribes of the Northern Paiute Nation that had claims before the Indian Claims Commission. See Northern Paiute Nation, 31 Cl. Ct. at 402 n.1.

legislature. Id. at 403. Following passage of three related acts and the negotiation of the agreement of July 20, 1906 between the Tribe and United States, the Tribe ceded 268,000 acres of reservation land, including the valuable mineral lands, to the government in exchange for "an irrigated allotment of 20 acres for each tribal member and $300 for each head of a family and retention of certain grazing and timber land." Id. After the cession, the Tribe was left with a reservation of only 51,000 acres, approximately 10,000 of which were allotted to individual Indians of the Tribe. Id. at 403-04. Although the government made some efforts to carry out its treaty obligations, "it is undisputed that the entire 10,000 acres were never irrigated." Id. at 404. The government defendant argued that "when tribal land is allotted, 'all water use rights appurtenant thereto pass to the allottees,'" id. (citation omitted), and moved for summary judgment on the ground that "the claim is an aggregation of individual Indian claims rather than a unitary tribal claim and therefore beyond th[e] court's jurisdiction," id. at 402. Defendant argued that any tribal interest in reservation lands was terminated by the act of allotment and therefore, that "any wrongdoing by the government in failing to provide water to the allotted land area resulted only in injury to individual allottees rather than the Tribe." Id. at 404.

The court in Northern Paiute Nation, applying the principles discussed above that were enunciated in Sac and Fox Indians, 220 U.S. 481, Hebah, 428 F.2d 1334, and Fort Hill Apache Tribe, 477 F.2d 1360, denied defendant's motion for summary judgment and held that the plaintiff Tribe had "a tribal claim for breach of defendant's obligation" "to provide the Tribe with a water supply for its irrigation system." 10 Cl. Ct. at 409-10. The cession of the Tribe's rich mineral lands and most of the land base of the reservation was made against the consideration promised to the Tribe of "irrigated allotments (including the irrigation system) and $300 to each head of a family." Id. at 409. While the benefits from the land cession were principally in the form of allotments to individual Indians, the court found that "the Tribe was to be the 'conduit' through which the consideration, i.e. the promised water, flowed." Id. (quoting Hebah, 428 F.2d at 1338). While acknowledging that allotment vests the allottee with an individual claim for water, the court held that "Tribal waters before the July 20, 1906 agreement continued to be Tribal waters subsequent to the said agreement subject to right of use in and by the allottees and their legal successors." Id. The court explained that "it does not diminish the allottees' water rights to hold that the water and irrigation system belong to the Tribe with a concomitant right to delivery of water in the allottees." Id.

The Northern Paiute Nation court also found the holding in United States v. Creek Nation, 476 F.2d 1290 (Ct. Cl. 1973), a case involving damages claimed for underpayment of tribal land ceded to the United States and for loss of land set aside for individual Creeks that was taken by land speculators and others "by gross frauds or worse," to be of assistance in distinguishing treaty-based group claims from individual

claims, even in situations where the eventual benefit (and its loss) was to flow to individuals. Northern Paiute Nation, 31 Cl. Ct. at 410. The government was willing to pay the difference between the value of the ceded land and the price negotiated in the treaty, but objected to payment for loss of the land set aside for individual Creeks, arguing that the latter involved individual claims. Id. The Court of Claims in Creek Nation rejected the government's argument finding that the government had not made a bona fide attempt to settle the Creeks on the set-aside lands, and held that

> [t]he rights which have been allegedly violated are those of the tribe. The 5,200,000 acres was tribal property. The treaty by which it was ceded to the United States was negotiated by representatives of the tribe on behalf of the tribe. Although rights of individuals may also have been violated, the wrong-doings complained of were only to the tribe.

Id. (citing Creek Nation, 476 F.2d at 1304 (quoting 26 Ind. Cl. Comm'n 410, 434 (1971) (Commissioner Davis, concurring)) (emphasis omitted). The court in Northern Paiute Nation explained that

> in the case at bar and in Creek Nation, both Tribes ceded certain lands to the government pursuant to an agreement or treaty. The primary consideration for the transfer in both cases would have benefitted individual members of the tribes. . . . With respect simply to the nature of the claim, the question in both cases is the same, viz., whether a tribal claim is presented when the government obligates itself pursuant to a treaty (agreement) with a tribe to take certain action that would ultimately benefit individual tribal members and then fails, entirely or at least materially, to fulfill the obligation. Creek Nation held that a claim of this character was tribal, and this court finds that holding quite pertinent relative to the facts and circumstances of this case.

Id. at 410-11 (emphasis added) (footnote omitted). There, as here, the alleged breach that underlies plaintiffs' claims is based on violation of a treaty-based right that, in the case of the trust funds held by government, was reinforced and renewed by subsequent statutes. While the funds held in trust by government "would ultimately benefit individual tribal members," the claim is based in a group or tribal right. Id. at 411.

While the subject of the group claim in Northern Paiute Nation is not the same as that before this court, the case is analogous in ways that should have been evident to defendant, given the apparent importance attached to the case from its use in defendant's reply brief. See Def.'s Reply, passim. For example, the court in Northern Paiute Nation distinguished the individual claims advanced by plaintiffs in Cherokee Freedmen, 161 Ct.

Cl. 510, and Absentee Shawnee Tribe of Okla. v. United States, 165 Ct. Cl. 510 (1964), two cases also relied upon by defendant here, from those of the allottees and plaintiff Tribe in regard to the treaty-based water rights at issue there. See Northern Paiute Nation, 10 Cl. Ct. at 404, 411-12. The court compared the rationale underlying the determination of the individual character of claims asserted in Cherokee Freedmen and Absentee Shawnee Tribe, noting that in the former case,

> [t]he court held that claims were individual since "[t]heir resolution would depend upon individual proof as to each Freedman that he was qualified, under the general standards laid down in the [relevant] treaty, to be enrolled as a Cherokee. . . . Further, the court in Cherokee Freedmen simply stated that there was 'no common right or group interest."

Id. at 411 (quoting Cherokee Freedmen, 161 Ct. Cl. at 789). The court found that "[a] similar rationale was also expressed in Absentee Shawnee Tribe . . . in finding that the claim was individual. There, the court said the claim, especially damages, 'would clearly depend upon proof of the special facts and circumstances pertinent to the particular . . . Shawnee [affected].'" Id. at 412 (quoting Absentee Shawnee Tribe, 165 Ct. Cl. at 515). The Northern Paiute court then stated, in a conclusion that this court finds dispositive of defendant's argument advanced in its Motion for Reconsideration, that "[h]ere, by contrast, the claim can be evaluated without considering 'the individual facts and circumstances pertinent to [a] particular person.'" Id. (quoting Cherokee Freedmen, 161 Ct. Cl. at 789).

Defendant's conception of "per capita claims" and "individual, vested property rights" created by the process of distribution of a communal asset, Def.'s Br. 21-22, is contradicted by long-established legal precedent. See, e.g., Sac and Fox Indians, 220 U.S. at 489-90; Blackfeather, 155 U.S. at 193; Hebah, 428 F.2d at 1337-38. The court is not free to ignore binding precedent and declare to be "a clear error of law," Def.'s Reply 1, legal principles that have been laid down by our circuit and the Supreme Court. As the United States Court of Appeals for the Federal Circuit has reminded us, "[t]here can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, [the Federal Circuit], and [its] predecessor court, the Court of Claims." Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) (citing First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1290 n.3 (Fed. Cir. 1999); see also South Corp. v. United States, 690 F.2d 1368, 1370 (Fed. Cir. 1982).

C. Due Process Considerations Under 28 U.S.C. § 1505

Defendant argues that, "given that the per capita claims are individually held, . . . the claims of absent individuals are being litigated, and due process requirements have not been met." Def.'s Recons. Mot. 1. Defendant's due process concern is based entirely on its characterization of plaintiffs' claims as "per capita claims" and its novel legal theory of creation of individual rights through the distribution of trust funds, thereby conferring "ownership" of the individual claims on individual beneficiaries. See Def.'s Br. 22. The court rejects defendant's argument as contrary to settled law and binding precedent. See supra Part II. B. The claims advanced by plaintiffs are group claims based on the alleged mismanagement of trust funds awarded to the Pembina Band of Chippewa Indians as compensation for underpayment of lands ceded to the United States in which members of the Pembina Band held an undivided interest. See Chippewa, 69 Fed. Cl. at 644-45. The first suit brought against the United States was brought as a group claim by an identifiable group of American Indians. See Red Lake, Pembina and White Earth Bands v. United States, 1 Ind. Cl. Comm'n 584, Docket No. 18-A (Sept. 17, 1951). The plaintiff group listed in the caption included the Red Lake, Pembina and White Earth Bands, the Minnesota Chippewa Tribe, and seven named individual plaintiffs. Id. Defendant in that action challenged the right of the Pembina Band to maintain the action because the Pembina Band no longer existed as a tribal entity, a fact conceded by plaintiffs. Id. at 588. The Indian Claims Commission, applying the holding from the first case docketed by that body–Loyal Creek Band or Group of Creek Indians v. United States, 1 Ind. Cl. Comm. 122, 129, Docket No. 1 (May 6, 1949)–found that

> the three classes of claimants who are permitted to assert claims under the Indian Claims Commission Act, namely, a "tribe, band, or other identifiable group" do not have to be existing political groups in order to be heard by the Commission. The controlling question is whether the claimant group can be identified and have a common claim. We believe that the decision in that case applies to the contention made by the defendant in the present suit.
>
> As the plaintiffs concede that the Pembina Indians are no longer organized as band, the question then is whether members, or descendants of members of the Pembina Band as it existed and was recognized at the time of the 1863 treaty, can be identified. If they can be so identified, then any one of their group is authorized by express statute to present this claim as a representative of all the members, as provided by Section 10 of the Indian Claims Commission Act (25 U.S.C. [§] 70a) . . . .
>
> . . . .

> [W]e believe the evidence shows quite conclusively there is a group of Pembina Indians now living who are descendants of members of the Pembina Band that was a party to the October 2, 1863 treaty out of which the present claim arose, and they can be identified and have a group claim which they are entitled to have determined by this Commission . . . . [W]e do not consider it necessary for jurisdictional purposes to determine who are all the individual members of said group. The plaintiffs have alleged in the petition and satisfactorily established by the evidence that the named individual plaintiffs, Rosetti Villebrun and Katherine Carl Barrett, are members of this group of Pembina Indians who are descendants of the original members of the Pembina Band and they are therefore entitled, under Section 10 of the Act[8], to maintain this action in a representative capacity on behalf of themselves and all other members of the claimant group.

Id. at 588-90 (citation omitted).

The present action was filed on September 30, 1992 by the Turtle Mountain Band of Chippewa Indians, the Chippewa Cree Tribe of the Rocky Boy's Reservation, and the Little Shell Tribe of Chippewa Indians of Montana on their own behalf, on behalf of their respective members, and on behalf of all beneficiaries of judgment funds awarded in certain settlements of land cession compensation suits. Chippewa, 69 Fed. Cl. at 640. The court granted plaintiffs' motion to add the White Earth Tribe as a plaintiff, finding that the relationship among the original parties and the White Earth Tribe, one of the original parties in the underlying litigation filed in the Indian Claims Commission, see Red Lake, Pembina and White Earth Bands v. United States, 1 Ind. Cl. Comm'n 584, Docket No. 18-A (Sept. 17, 1951), was "long-standing, recognized in case law and in statute, and fully satisfie[d] the requirement under RCFC 15(c)," Chippewa, 69 Fed. Cl. at 668. The court also added thirty-four named individuals as "members of the plaintiff group." Id. at 674. The named individuals represent each of the four subgroups that participated in the distribution of the 1964 Award (eligible members of the Turtle Mountain Band, Chippewa Cree Tribe, White Earth Band, and the group of nonmember Pembina lineal descendants), and the five subgroups that participated in the distribution of the 1980 Award (eligible members of the Turtle Mountain Band, Chippewa Cree

[8] Section 10 of the ICC Act provided, in pertinent part, that "[a]ny claim within the provisions of this Act may be presented to the Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all its members." ICC Act, ch. 959, § 10, 60 Stat. 1052 (1946) (codified at 25 U.S.C. §§ 70-70w (1946).

Tribe, Little Shell Tribe, White Earth Band, and the group of nonmember Pembina lineal descendants).

Defendant argues that "[t]he only entity able to bring claims under the Indian Tucker Act is the group itself, the stakeholder that owns the claim. Individuals cannot claim the right to litigate for or on behalf of the group itself." Def.'s Br. 25. Defendant's assertion is fundamentally at odds with established law regarding group claims, see, e.g., Red Lake, Pembina and White Earth Bands, 1 Ind. Cl. Comm'n at 588-89, Docket No. 18-A (quoted above); Cherokee Freedmen, 195 Ct. Cl. at 45 (noting that "a named claimant" must show that it "is properly such an 'identifiable group' which can pursue litigation itself, or on whose behalf it can be carried on by an individual member"); Snoqualmie Tribe of Indians v. United States, 372 F.2d 951, 957 (1967) (finding that "[w]here there is no existing tribal organization, a claim may be presented . . . by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all of its members'") (emphasis and internal quotation marks omitted), and is contradicted elsewhere in defendant's brief, see Def.'s Br. 26 (citing Upper Chehalis Tribe v. United States, 155 F. Supp. 226, 230 (Ct. Cl. 1957) (group was adequately represented by one of its members); Nooksack Tribe of Indians v. United States, 3 Ind. Cl. Comm'n 475, 481 (1955) (ICC had jurisdiction over claims brought by a member of the group)). Defendant specifically argues that the tribal plaintiffs cannot litigate the claims before the court because "[t]he Tribes are not the stakeholders of the PJF per capita claims." Def.'s Br. 25; see also Def.'s Recons. Mot. 1. Plaintiffs reject defendant's contention, arguing that "[t]here is no clear error or manifest injustice on this point because the Plaintiff Tribes themselves clearly are members of the plaintiff group. They therefore can represent any and all other members of the group." Pls.' Resp. 13 (citing, inter alia, Peoria Tribe of Indians of Okla. v. United States, 169 Ct. Cl. 1009, 1009 n.2 (1965) (finding that what matters is that no interested party is excluded, i.e., that all interested parties are represented by the representative plaintiffs)).

The court now has before it a single group plaintiff that includes both tribal plaintiffs and named individual plaintiffs as representatives of the "beneficiaries of the 1964 and 1980 Awards." See Chippewa, 69 Fed. Cl. at 673-74. The group claim involves alleged losses to communally-held trust funds while the funds were under the care of the United States. See Pls.' Resp. 13-14. The distribution of any damages determined to be the result of the alleged breach of the trustee's fiduciary duties will follow the guidelines laid out by Congress in the 1971 and 1982 Distribution Acts. See Snoqualmie Tribe, 372 F.2d at 957 ("Awards are for all members of the group and not to be shared only by successful descendant-claimants. 'How the award is to be paid and precisely who can participate . . . are questions for Congressional and administrative determination.'" (quoting Peoria Tribe, 169 Ct. Cl. at 1011-12)). While defendant's

contention that individuals cannot bring group claims and that the tribal plaintiffs cannot represent other group members is without merit, Def.'s Br. 25, the court accepts the truism cited by defendant, that, "[i]f the claims litigated belong to the group that is before the Court, then the parties before the Court are the same as the stakeholders . . . . There are no 'absent parties' whose interests need to be protected." Def.'s Reply 10-11. All stakeholders, to borrow defendant's characterization, are before the court. See Def.'s Reply 10. As representatives of all the beneficiaries of the 1964 and 1980 Awards, there is no adversity among members of the plaintiff group.[9]

---

[9]In its Motion to Reconsider, defendant requests the court to "deny[] Plaintiffs' motion for class certification on the grounds argued in the United States' opposition briefs and Motion to Supplement the Record with Declaration of Ross O. Swimmer [Motion to Supplement or Suppl. Mot.]." Def.'s Mot. 2. In its Opinion of January 26, 2006, plaintiffs' Renewed Motion for Class Certification was deemed moot in regard to class certification while allowing the thirty-four named individuals in the motion to be added as a part of the plaintiff group. Chippewa, 69 Fed. Cl. at 674. The basis for defendant's request appears to be the possibility of adversity between a tribal plaintiff and one or more individual PJF beneficiaries. See Def.'s Suppl. Mot. 1-2. In his declaration, Mr. Swimmer recounts details of a conversation with the Chairman of the Turtle Mountain Band regarding the status of the Band's request for the return of unclaimed per capita beneficiary funds. Ross Declaration ¶ 2. Based on the correspondence provided as an exhibit to defendant's Motion to Supplement, the Turtle Mountain Band sought the return to the Band of those unclaimed per capita payments that were attributable to Turtle Mountain Band members. See Def.'s Suppl. Mot, Exhibit A.

This request was made in conformity with 25 U.S.C. § 164, titled "Restoration to tribal ownership of unclaimed per capita and other individual payments of tribal trust funds; deposit in general fund of the Treasury." 25 U.S.C. § 164 (2000). In this statute, Congress provides a legal mechanism by which tribal or group funds allocated to an individual tribal or group member that have been left unclaimed for six years from the date of the payment order may be restored to the tribe or group. Id. Unclaimed payments of individuals not represented by a tribe or organized group are to be deposited in the general fund of the Treasury. The statute provides in pertinent part that

> the share of an individual member of an Indian tribe or group in a per capita or other distribution . . . of Indian tribal or group funds held in trust by the United States, or in an annuity payment under a treaty, . . . and any interest earned on such share that is properly creditable to the individual shall be restored to tribal ownership if for any reason such share cannot be paid to the individual entitled thereto and remains unclaimed for a period of six years from the date of the administrative directive to make the payment . . . , whichever occurs later: Provided, That if such individual is a member of an Indian tribe or group that has

(continued...)

At present, all plaintiffs have chosen to be represented by the same legal counsel. This is not a requirement for a group plaintiff, but rather, reflects the circumstances of the development of the underlying suit. Given the nature of the group claim and the established framework within which any damages awarded by the court would be distributed, there is an obvious economy to the current arrangement.

D. Trustee's Fiduciary Duty in the Context of Litigation

The characterization of plaintiffs' claims as individual claims rather than group claims, see Def.'s Br. 5-6, appears to the court to be a litigation strategy intended to avoid or minimize judicial consideration on the merits of defendant's possible liability for breaches of defendant's duties as a trustee. If successful, defendant would deprive the tribal plaintiffs of standing to bring suit for damages resulting from alleged trust fund mismanagement in regard to the entirety of the 1964 Award which was distributed on a per capita basis, and for the eighty percent of the 1980 Award that was distributed on a per capita basis. Def.'s Br. 25 ("The Tribes have no demonstrated right or authority to represent or litigate individual claims belonging to the per capita beneficiaries."). According to defendant, "[t]he Tribes cannot claim to be PJF per capita beneficiaries of either the 1964 [or] 1980 awards; their only interest is in the twenty-percent of the 1980 award allocated as Tribal program funds that remains held in trust." Id.

Defendant argues that individual Indians are not deprived of a forum for individual claims "since individuals can bring claims under the Tucker Act, 29 U.S.C. § 1491."

---

[9](...continued)

> no governing body recognized by the Secretary of the Interior as authorized to act on behalf of the tribe or group, such unpaid share and interest shall be regarded as not capable of restoration to a tribal or group entity and shall be deposited in the general fund of the Treasury of the United States.

25 U.S.C. § 164 (emphasis added). The court does not share defendant's concern that the Turtle Mountain Band, by seeking to apply a statute for the express purpose for which it was enacted by Congress, is somehow adverse to individual members of the Band whose per capita distributions were left in the Treasury unclaimed for well beyond the statutory period. Even if the court were to reconsider its decision regarding plaintiffs' class action certification motion–which it does not–defendant's assertion at this time of such "evidence" would not challenge the court's conclusion that it "does not find any significant obstacle to class certification." Chippewa, 69 Fed. Cl. at 670.

Def.'s Br. 11.[10] Defendant's objective of inoculating the bulk of the PJF from legal challenges of mismanagement while the funds were held in trust by the government is revealed in summary form in its reply brief. See Def.'s Reply 1. Defendant argues that

> [c]lassifying the individually-held, vested per capita claims as a "group claim" is a clear error of law. If allowed to stand, the ruling will result in manifest injustice by failing to guarantee the due process rights of individual per capita PJF beneficiaries who are not before this Court. The Court should also deny Plaintiffs' motion for class certification for the reasons stated in the United States' opposition and reply briefs to Plaintiffs' motion and in the Supplemental Declaration of Ross Swimmer, and order the Plaintiffs to demonstrate a valid basis for litigating claims held by PJF per capita beneficiaries.

Id. (citation omitted). Defendant would therefore "protect" the rights of individual PJF beneficiaries first, by denying them coverage as part of a group under the court's Indian Tucker Act jurisdiction and, second, by denying those same beneficiaries the opportunity to participate as class members under RCFC 23, the court's class action provision. If successful, defendant's litigation strategy could deflect from the government the responsibility to account for its management of some or all of roughly $53 million of Indian trust funds, the approximate combined value of the 1964 Award and the 1980 Award without interest, and the cost of reimbursing any losses found to have resulted from the breach of its duty properly to manage and invest the funds held in trust following a trial on the merits.

In its Motion for Reconsideration, Defendant has not challenged the court's holding that the judgment funds held by the government are trust funds, see 69 Fed. Cl. at 656, nor has it challenged the court's holding that the government has a fiduciary responsibility to invest those funds as required by relevant statutes, see id. at 662. The general trust relationship between the United States and the Indians, long recognized by the courts, see, e.g., Mitchell II, 463 U.S. at 225 (noting the "undisputed existence of a general trust relationship"); United States v. Mason, 412 U.S. 391, 398 (1973) (acknowledging that the United States, as trustee, "is duty bound to exercise great care in administering its trust"); Cherokee Nation v. Georgia, 30 U.S. 1, 17 (1831) (comparing

[10]In a puzzling argument, defendant warns the court against "apply[ing] the 'dual jurisdictional' dicta in Wolfchild I . . . that blurs the distinction between individual and group claims." Def.'s Br. 19 (citing Wolfchild v. United States, 62 Fed. Cl. 521, 534, 540-41 (2004)). Defendant's extended critique of the rulings and analysis in that case, see Def.'s Br. 19-21, is not relevant here, where the court has found a claim within the jurisdictional grant of 28 U.S.C. § 1505.

the relationship between the United States and Indian tribes to that of a guardian to his ward), implicates a "distinctive obligation of trust incumbent upon the Government in its dealings" with the tribes, Mitchell II, 463 U.S. at 255 (quoting Seminole Nation v. United States, 316 U.S. 286, 296 (1942). Because of its treaty-based and statutory duties to plaintiffs, "the United States must be held to the 'most exacting fiduciary standards' in its relationship with the Indian beneficiaries." Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1348 (Fed. Cir. 2004) (quoting Coast Indian Cmty. v. United States, 550 F.2d 639, 652 (Ct. Cl. 1977)).

## III. Conclusion

For the foregoing reasons, defendant's Motion for Reconsideration is DENIED.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge